**Mark B. PRICE, Plaintiff,**

v.

**CUSHMAN & WAKEFIELD, INC. and Joanne Podell, Defendants.**

**No. 08 Civ. 8900 (SC).**

United States District Court,
S.D. New York.

Nov. 3, 2011.

Mark H. Moore, Alice Keeney Jump, Reavis Parent Lehrer LLP, New York, NY, for Plaintiff.

Kristin Marie Burke, Arthur J. Robb, Robert Allen Sparer, Sheryl A. Orwel, Clifton Budd & DeMaria, LLP, New York, NY, for Defendants.

### MEMORANDUM OF DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL CONTI, District Judge.

## I. INTRODUCTION

In this suit, Plaintiff Mark B. Price ("Price" or "Plaintiff") seeks relief from alleged employment discrimination and breach of contract by Defendants Cushman & Wakefield, Inc. ("C & W") and Joanne Podell ("Podell"). Plaintiff worked as a real estate broker for C & W from 2003 to 2006, and Podell was his supervisor for much of this period. Plaintiff, a member of a branch of Judaism called Chabad, contends that Defendants discriminated against him because of his religious beliefs and practices. *See* ECF No. 1 ("Compl."). He contends that Defendants engaged in numerous acts of discrimination, culminating in their refusal to pay him commissions owed and the eventual termination of his employment. ECF No. 79 ("Pl.'s Trial Br.") at 1. These acts, Plaintiff argues, violated federal, state, and local anti-discrimination laws, and breached Plaintiff's oral commission-sharing contract with Podell as well as his employment contract with C & W. *Id.* at 1–2.

Defendants deny that they discriminated against him or breached any contractual agreements. They contend that his employment was terminated due to poor performance and disruptive behavior. ECF No. 81 ("Defs.' Trial Br.").

## II. PROCEDURAL HISTORY

Plaintiff filed this action October 16, 2008, asserting thirteen claims that fall generally into two categories: discrimination claims and contract-related claims. *See* Compl.

### A. Discrimination Claims

Plaintiff alleged that Defendants engaged in numerous acts of discrimination in violation of three parallel statutes: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. section 2000e, *et seq.;* the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.;* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq.* Plaintiff asserted four bases for liability under these statutes: (1) disparate treatment;[1] (2) hostile work environment; (3) failure to provide reasonable accommodation; and (4) retaliation. *See* Compl. ¶¶ 133–152; *see also* Pl.'s Trial Br. at 27–37.

### B. Contract-related Claims

Plaintiff also asserted claims against C & W and Podell for breach of contract and breach of the covenant of good faith and fair dealing. Compl. ¶¶ 153–163, 186–192. Specifically, he alleged that C & W breached two contracts: the anti-discrimination provisions of its Policy Manual, and the terms of Plaintiff's employment contract. *Id.* at ¶¶ 153–159. He alleged that Podell breached a single, oral commission-split-ting agreement whereby, according to Plaintiff, Plaintiff would receive twenty percent of all commissions received from deals that Podell originated and would receive fifty percent of all commissions from deals that Plaintiff originated. *Id.* at ¶¶ 186–188. Plaintiff also asserted claims for unjust enrichment against both C & W and Podell and a claim against Podell for tortious interference with contractual relations. *Id.* at 171–178. Lastly, Plaintiff alleged that C & W violated New York Labor Law § 190, *et seq.,* by refusing to pay him commissions owed within the statutorily prescribed time period. *Id.* at ¶¶ 164–169.

### C. Claims Remaining for Trial

On February 24, 2009, Defendants filed a motion to dismiss, which the Court partially granted. ECF Nos. 10 ("MTD"), 24 ("Sep. 26, 2009 Order, 2009 WL 3075599"). The Court dismissed Plaintiff's claims against C & W and Podell for breach of the covenant of good faith and fair dealing, Plaintiff's claim against C & W for unjust enrichment, and Plaintiff's claim against Podell for tortious interference with contractual relations. Sep. 26, 2009 Order at 15.

Defendants filed a motion for summary judgment on February 11, 2011, which the Court also partially granted. ECF Nos. 46 ("MSJ"), 64 ("Sep. 7, 2011 Order, 808 F.Supp.2d 670, 2011 WL 3962652"). The Court granted summary judgment on

---

1. At trial, Plaintiff's counsel referred to this basis for recovery as Plaintiff's "adverse employment action" claim. This terminology is more appropriate because both "adverse employment action" and "hostile work environment" claims are technically subsumed under the label "disparate treatment." *See Feingold v. State of New York,* 366 F.3d 138, 149 (2d Cir.2004) ("A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment."). Accordingly, the Court treats Plaintiff's disparate treatment claim as consisting of two subparts—adverse employment action and hostile work environment—in the analysis below.

Plaintiff's breach of contract claim against C & W for violation of the anti-discrimination provisions in its Policy Manual. Sep. 7, 2011 Order at 55, 808 F.Supp.2d at 702. The Court also granted summary judgment on Plaintiff's Title VII claim as it relates to any acts other than Plaintiff's termination, and granted summary judgment on Plaintiff's state law discrimination claim as it relates to any acts other than Defendants' commission-splitting decisions and Plaintiff's termination. *Id.* However, the Court denied summary judgment on Plaintiff's city law discrimination claim as it relates to any and all of Defendants' numerous alleged acts of discrimination. *Id.* The Court also ruled that Plaintiff had abandoned his claim for violation of New York Labor Law § 190 *et seg. Id.* at 48 n. 19, at 704 n. 19.

After the Court's rulings on Defendants' motion to dismiss and motion for summary judgment, the following claims survived for trial: (1) disparate treatment based on Plaintiff's religion;[2] (2) hostile work environment based on Plaintiff's religion;[3] (3) failure to reasonably accommodate Plaintiff's religious practices;[4] (4) retaliation against Plaintiff for complaining about religious discrimination;[5] (5) breach of an oral commission-splitting contract against Podell; (6) unjust enrichment against Podell; and (7) breach of Plaintiff's employment contract against C & W.

The Court held an eight-day bench trial, lasting from October 5, 2011 to October 17, 2011. The Court, by this Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that Plaintiff has failed to prove any of his claims by a preponderance of the evidence.

## III. FINDINGS OF FACT

### A. The Parties

1. Plaintiff Price is a 53 year old resident of New Jersey. Price Test. He worked as a broker in C & W's New York City office from January 2003 through his termination on October 23, 2006. *Id.* Prior to working as a broker, Price was a pharmacist for approximately 20 years, and, currently, he is employed as a pharmacist. *Id.* Price is married with two living children. *Id.* Price's third child, Noah, who was born on May 9, 2002 with a rare and highly malignant brain tumor, died in October 2005. *Id.* Price's wife Lisa, a podiatrist, quit her practice to care for Noah full-time. *Id.*

2. C & W is a world-wide commercial real estate services firm offering, among other things, tenant and landlord brokerage services in office, industrial, and retail real estate.

3. Podell, who is Jewish, was recruited by C & W from her prior employer New Spectrum Newmark Real Estate ("Newmark") in 2002. Podell Test. When she

---

**2.** This claim survives under Title VII with regard to Plaintiff's termination, under state law with regard to Plaintiff's termination and C & Ws commission-splitting decision, and under city law with regard to all of Defendants' allegedly discriminatory actions. *See* Sep. 7, 2011 Order at 55, 808 F.Supp.2d at 685–86.

**3.** This claim survives under state and city law only. *Id.*

**4.** This claim survives under city law only. *Id.*

**5.** This claim survives under Title VII with regard to Plaintiff's termination. It survives under state law with regard to Plaintiff's termination and C & W's commission-splitting decision and denial of arbitration. It survives under city law with respect to each of the above events and Plaintiff's move to the eighth floor. *Id.*

joined C & W, she brought several high profile clients, including Anne Klein, Ann Taylor, Ethan Allen, and Jones Apparel Group, and she received a $150,000 signing bonus for joining the firm. *Id.* During the time period relevant to this dispute, Podell was a senior broker who led a team of more junior brokers in C & W's Retail Brokerage Group. *Id.* By the spring of 2006, Podell had over fourteen years of experience in the retail industry and as a broker in retail leasing. *Id.* During the relevant time period, Podell was a Senior Director of Retail Services at C & W. *Id.* She did not have hiring and firing authority. *Id.*

### B. Price Joins C & W

4. By 1999, Price had become discontent with his career as a pharmacist. Price Test. He began seeing a psychiatrist, Dr. Howard Welsh ("Welsh"), who diagnosed him with dysthymic disorder, a mild form of depression. Welsh Test. Welsh testified that Price's depression at the time was caused by difficulties in his marriage, difficulties with an adopted daughter, and deep dissatisfaction with his career as a pharmacist. *Id.* Welsh prescribed several different antidepressant medications for Price, but the medications did not help much. Price Test.

5. In or around 2000, Price decided to switch careers and try real estate brokerage. *Id.* An acquaintance had suggested to him he could earn more money than he was earning as a pharmacist, and Price hoped that he would find real estate a more enjoyable career. Price Test.

6. In 2000, Price began work at Eastern Consolidated ("Eastern"), a brokerage firm specializing in commercial properties. *Id.* Price carried the title of Director and specialized in the sale of commercial buildings. *Id.* The career change eased his depression somewhat because he became excited to go to work again. *Id.*

7. In May 2002, Price's wife gave birth to twins. *Id.* Three months later, around August 2002, one of the twins, Noah, was diagnosed with a highly malignant brain tumor. *Id.* Price's wife gave up her career as a podiatrist to be with Noah full time. *Id.* His son's illness and the financial pressures of his wife's unemployment created heightened anxiety for Price. *Id.* According to Welsh, Noah's illness left Price "devastated" and "frightened" but not "clinically depressed." Welsh Test. at 393:20–394:22.

8. In December 2002, two of Price's senior colleagues at Eastern, John Epstein ("Epstein") and Charles Kingsley ("Kingsley"), informed Price that C & W was recruiting them and asked whether he wished to join them in moving to C & W. *Id.*

9. Epstein, Kingsley, Price, and another broker joined C & W's Financial Services Brokerage Group ("FSG") in January 2003 and worked as a team led by Epstein (the "Epstein Team"). *Id.* The team agreed to an across-the-board commission-split whereby Epstein and Kingsley, the more experienced brokers, each earned 27.5 percent of the team's commissions, while Price and the other less experienced broker would earn a 22.5 percent split. *Id.*

10. At C & W, most brokers work as part of teams, each headed up by one or more experienced brokers, who give direction to the more junior members. *Id.*

### C. Price's Contract with C & W

11. Price's contract, entitled "Broker–Salesperson Employment Contract," with an annexed Schedule of Compensation ("Contract"), was executed on January 8, 2003. Ex. P–1. Price's Contract contains a

dispute resolution procedure for resolving disputes among brokers over commission-splits. The relevant provisions in the Schedule of Compensation state:

(A) If a broker has a dispute with one or more other brokers, such broker will first seek to have the dispute resolved with the assistance of the appropriate Branch Manager(s) or Regional Director(s). Every effort must be made to resolve the dispute at this level. It is the responsibility of each Branch Manager and Regional Director to ensure that every effort has been made to resolve the dispute before beginning the arbitration process. Please note that these procedures do not apply to disputes between brokers and C & W.

. . .

(C) All disputes that cannot be resolved under (A) above will be resolved through the process of binding arbitration as described herein. After all conditions to arbitration have been satisfied, the party demanding arbitration must deliver a written notice to his Branch Manager (with a copy to his Regional Director, the General Counsel and the other disputant(s)) stating the party's intent to seek arbitration and describing the dispute to be arbitrated.

Ex. P–1 at Art. VII.A, C.

12. Commission disputes cannot proceed to arbitration unless the real estate transaction has closed and payment of the commission is assured. Reingold Test.[6] If brokers dispute commission-splits from more than one deal, then separate arbitrations must be held for each deal at issue. *Id.*

13. Price's Contract also contains provisions regarding management decisions on the allocation of commissions between brokers:

C & W shall at all times have the sole and absolute right to determine the commission or fee to be charged to any customer and the sole discretion to decide whether any transaction on which Employee has been working is consummated in whole or in part by Employee's efforts. If any commission or fees are determined to be due and C & W personnel other than Employee contributed to or assisted in consummating any such transaction, whether such other personnel are employed on a salary or commission basis, Employee shall abide by and accept C & W's decision with respect to determination of the amount of and the allocation of Employee's share in the commission or fee.

Ex. P–1 at ¶ 7.

### D. *Price Joins Podell's Team*

14. The year 2003 proved to be a very poor year financially for the Epstein team. Price Test. In early 2004, Epstein asked Price to leave his team because "the team wasn't performing" and "[Price] wasn't performing." *Id.* at 29:3–7.

15. After Price left the Epstein Team, Timothy Welch ("Welch"), who was in charge of the Financial Services Group, agreed to keep Price on at C & W as an independent broker (i.e., a broker who is not assigned to a team) within the Hotel Group through at least June 2004. *Id.* Welch later extended Price's time to September 2004. *Id.* Price felt it was very important to remain employed by C & W because of the generous health insurance coverage he received from C & W, which he needed to cover his ill son's extensive medical expenses. *Id.*

---

**6.** Suzy Reingold ("Reingold"), served as Branch Manager of the New York C & W office during the events at issue. She testified as a witness for Defendants.

16. After working as an independent broker for four or five months, Price joined Podell's retail leasing team around August 2004. Price Test.; Ex. P–178. Podell was the leader of the team, which provided brokerage services for businesses seeking to lease commercial space. Podell Test. During their early discussions, Price told Podell in detail about his son Noah's illness, but he promised that if he joined her team that he would work hard and diligently. Price Test.; Podell Test. Podell expressed sympathy for Price's difficult situation. *Id.*

17. At the time Price joined Podell's team, he had no professional retail brokerage experience (save renewing and executing various leases for pharmacy space in his prior career as a pharmacist). Price Test. He did not have any retail clients. *Id.* Price offered to join Podell's team on a three-month trial basis in an effort to convince Podell to let him join her team. *Id.* at 315:25–316:2. Podell agreed to teach Price the business of retail leasing. *Id.* at 319:25.

18. Thereafter, and until April 26, 2006, Podell acted as Price's supervisor at C & W. *Id.* Approximately two or three months into Price's tenure on Podell's team, the other members of the team left for various reasons. *Id.* Thus, for most of the period Price worked with Podell, he was the only other licensed broker on her team. *Id.*

19. From August 2004 through most of 2005, Podell and Price made an excellent team and met with considerable success. Price Test.; Podell Test.

### E. *Price and Podell's Commission Dispute*

20. Price and the other real estate brokers working at C & W were compensated based on commission income generated by transactions on which they worked. Price Test.; Podell Test. Team leaders have sole authority to set commission splits for the members of their team, and arrangements may vary substantially from team to team. Podell Test.; Harbert Test.[7]; Reingold Test.

21. In early 2006, a dispute arose between Price and Podell as to the terms of Price's compensation arrangement. Price Test; Podell Test. The dispute arose when Price remarked to Podell that, based on anticipated commissions from deals the team was currently working on, he expected to make dramatically more in 2006 than he had in 2005. *Id.* Podell responded with surprise to this remark and stated that their arrangement was that Price would receive $200,000 with any additional compensation to be awarded at Podell's discretion. *Id.* This initial conversation sparked a protracted dispute between Price and Podell over what share of commissions Price was owed on past and pending deals.

22. At trial, Price and Podell offered two very different versions of Price's compensation arrangement. Price testified that at the very beginning of his three-month trial period working for Podell, he negotiated an agreement whereby he would get twenty percent of the team's commissions on deals that Podell originated and fifty percent on deals that he originated. Price Test. According to Price, their negotiations began when Podell asked Price how much he earned previously on the Epstein team, and he told her that he had earned about $200,000. *Id.* at 327:4–9. Podell then asked Price what commission split he had earned on the

---

7. Joseph Harbert ("Harbert"), C & W's Chief Operating Officer for the New York Metro Region, testified as a witness for Defendants.

Epstein team, to which he answered 22.5 percent. *Id.* at 329: 6–7. Podell next asked Price what percentage split he thought would be fair for his work on her team, to which Price answered thirty percent. *Id.* at 327:6–9. Podell responded that such a high split was "ridiculous," and the two "wound up at 20 percent." *Id.*

23. Podell testified that no negotiations ever took place and that no such agreement was ever reached. Podell Test. According to Podell, the topic of Price's compensation did not arise until he had been working for her for several months. *Id.* When the topic did arise, she promised Price that she would do her best to get him to the $200,000 in commissions that he had been making as a member of the Epstein Team. *Id.* Any additional compensation above and beyond the $200,000 figure was to be awarded at Podell's sole discretion based on the team's performance and her assessment of the value Price had added to each deal. *Id.* According to Podell, their compensation discussions did not include any talk of what the particular commission splits would be on any given transaction. *Id.* Podell testified that some manner of commission sharing was necessary to get Price to the promised amount of $200,000 in total commissions, and an 80/20 split was simply used as an expedient mechanism to get him to that number. *Id.*

24. The Court finds Podell's testimony as to Price's compensation arrangement more credible than Price's. Price was unable to produce persuasive evidence to corroborate his account of the arrangement. He called four witnesses—his wife; one of his rabbis; a former coworker at C & W; and his psychiatrist—each of whom testi-

fied that Price had told them he was promised twenty percent of all commissions that the Podell team received.

25. The testimony by Plaintiff's witnesses that Plaintiff told them he had an 80/20 commission sharing agreement with Podell may show that Price sincerely believed that this was the arrangement, but it does not demonstrate that Podell actually agreed to such an arrangement. Indeed, the Court finds it likely that Price simply misinterpreted the situation and did in fact believe he was entitled to an 80/20 split. On this point, the Court cannot overlook the facts that Plaintiff was under dire stress at the time due to his son's grave illness and the financial pressures it created, and that Plaintiff was struggling with psychological difficulties even well before the onset of his tragic ordeal with Noah. He was under continuous psychiatric care dating back to 1999. It may well be that the severe psychological pressures Plaintiff was under while working for Podell distorted his perception of events in the workplace.

26. Price also adduced billing statements showing that he received twenty percent of the team's commissions on deals from 2005, and he produced a chart that he had prepared for C & W management purportedly showing that he and Podell split commissions on an 80/20 basis for every deal they worked on together in 2005.[8] Exs. P–217; P–174. Podell does not dispute that Price received a twenty percent split on these deals. However, the total commissions Price earned on these deals was approximately $180,000, well below the $200,000 figure that Podell claims she promised Price. *See* P–174. Therefore, this piece of evidence does not prove that

---

8. As of the time Price prepared the chart, he had not received commissions on four deals because Podell asked him to allow her to keep the total commissions from the deals so that

she would exceed one million dollars in commissions for the year and win a prestigious award. Price later received his commissions for those deals. Price Test.

Podell agreed to an 80/20 split on all deals even above and beyond a $200,000 cap. If Price had adduced evidence to show that he received a twenty percent share of deals *even after* reaching $200,000 in total earnings for the year, such evidence would support his testimony. The documents produced, however, are consistent both parties' testimony.

27. Other evidence showed that Price had little to no experience in retail leasing when he joined Podell's team; he very much wanted to stay at C & W for health insurance purposes due to his son's illness; he joined Podell's team on a trial basis; Podell agreed to teach him the retail leasing business; and Podell was a highly successful broker in the retail leasing industry who controlled the business of numerous prominent retail clients. Under these facts, Price was not negotiating from a position of strength, and the Court finds it unlikely that he convinced a broker as prominent as Podell to share twenty percent of her business with him. Also, a collection of notes that Price prepared for a later meeting with Harbert undermine his trial testimony. In these notes, Price states that "every deal was at 20% *implied* contract." Ex. P–189 (emphasis added). This reference to an implied contract contradicts Price's detailed trial testimony about the back-and-forth negotiations that allegedly took place with Podell and the express agreement that allegedly resulted.

### F. *Reingold's Resolution of the Dispute*

28. In an effort to resolve their dispute, on March 27, 2006, Podell e-mailed Price, proposing a commission-splitting arrangement for 2006 under which Price would receive twenty percent of the first $1 million dollars of commissions earned by the team; fifteen percent of the next $500,000, ten percent of the $500,000 above that, eight percent of the next $500,000, six percent of the $500,000 above that, and two percent on any commissions over $3 million ("the 2006 Proposal"). Ex. P–147. Commissions on any deals Price brought in would be split fifty-fifty. *Id.* Under this proposal, if the team earned $3 million dollars, Price would earn $395,000 in commissions. He would then receive two percent of all commissions the team earned above and beyond $3 million.

29. Price "was very upset" by the 2006 Proposal because he believed she was reneging on their prior agreement. Price Test. at 197:5–23. After receiving the email, he entered Podell's office, placed the email on her desk, said "this is not what we agreed on. I don't know where you got this from," and walked out of the office. Price Test. at 203:18–20.

30. Price then complained to Dennis Waggner, C & W's Managing Director for the New York Tri–State Region. Price Test. Waggner suggested that that Price seek the assistance of Reingold, C & W's Executive Managing Director for New York City. *Id.* Reingold, who is Jewish, was in charge of managing all operations of the New York City offices, brokerage, and administrative staff, while reporting to Harbert.[9] Reingold Test. One of Reingold's responsibilities was the resolution of commission disputes between brokers. *Id.*

31. Price also complained about the commission dispute to Reingold, Grace Ben–Ezra ("Ben–Ezra") of human resources, Intan "Tani" Brown ("Brown"),[10]

---

**9.** Harbert has been C & W's Chief Operating Officer for the New York Metro Region since 2004, primarily responsible for ensuring that brokerage, including its support functions, performed smoothly and effectively. Harbert Test.

**10.** Brown was Director of Retail Services during the events in dispute. She testified as

and another broker named Gene Spiegelman ("Speigelman"). Price Test. Price also raised the issue with Tony Marano ("Marano"), C & W's Chief Operating Officer of the Americas at the time. *Id.* Marano told Price that Reingold was the appropriate person to speak to about the matter and that she would resolve the dispute. *Id.*

32. Reingold held a meeting on April 26, 2006 with Price, Podell, and Brown to discuss Price's dissatisfaction with Podell's 2006 Proposal and the future financial arrangement between Price and Podell. Price Test.; Reingold Test.; Podell Test.; Brown Test. At this meeting, Price formally rejected Podell's 2006 Proposal and declared that he could no longer work with Podell and was quitting her team. *Id.*

33. During or shortly after the April 26, 2006 meeting, Price requested arbitration of the proper commission allocation for deals that he had worked on but for which he had not yet been paid (henceforth, "the disputed transactions"). Price Test.; Reingold Test. Reingold determined that arbitration was not appropriate in this case and that she would render a management decision as to how commissions should be divided for the disputed transactions. *Id.* At trial, she explained that she determined arbitration was not appropriate because disputed transactions must be arbitrated one at a time in separate arbitrations, three brokers would have to take time away from generating business to preside over each arbitration, only the disputes that had actually closed could be arbitrated, and the loser of each arbitration stood to lose up to $150,000 in costs. *Id.* She explained that arbitration was more appropriate in situations where

two brokers, or two teams, were arguing over who should receive a single disputed commission. *Id.*

34. Both Podell and Price "lobbied" Reingold prior to the issuance of her management decision. *Id.* Price sent Reingold a detailed memorandum, prepared with the help of an attorney, setting forth his position that he was entitled to twenty percent on all transactions and listing his role in the disputed transactions. Ex. P–171. Podell sent Reingold an email setting forth her position that the 2006 Proposal was more than fair and stating that Price's role in the disputed transactions was a "support" role, not an "instrumental" one. Ex. P–152. Reingold reviewed the information submitted by both parties in reaching her decision. Reingold Test.

35. Reingold issued her decision on June 16, 2006. Ex. P–178. She concluded, as the Court concluded above, that Podell's version of the commission arrangement was more plausible. She acknowledged that. Podell gave Price twenty percent on some of the deals in an effort to reach the goal of $200,000, but she determined that this did not constitute a promise of future split arrangements. *Id.* She determined that Price's commissions for 2005 would be adjusted upward by about $39,000 to get him to the $200,000 figure promised, and she stated that such an upward adjustment was being processed. *Id.* Reingold further determined that Podell and Price had no compensation agreement for 2006 because Price had rejected Podell's offer. *Id.* Accordingly, Reingold issued a determination of what percentage of commissions each party would receive on five disputed transactions that closed in 2006. *Id.* She determined that Price would receive between

---

a witness for Defendants. One of her duties was to provide "support and guidance" to brokers in the retail group. Brown Test. Subsequent to the events at issue in this case,

Brown changed her name to Intan Gelber. The Court refers to her as Brown herein for the sake of simplicity.

two and four percent on four of the deals that Podell had originated and would receive fifty percent on the one deal that Price had originated. *Id.*

36. Reingold testified at length about the basis for her decisions. She rejected Price's claim that Podell had agreed to split all commissions on an 80/20 basis because she found it simply implausible that Podell would assign a fixed twenty percent of her business to someone such as Price, who had no retail brokerage leasing experience and was unfamiliar with her business. Reingold Test. She explained that, in her thirty years of experience, she had never seen anyone promise a twenty percent across-the-board split to someone as junior as Price. *Id.*

37. In determining the proper allocation of commissions for the disputed transactions, Reingold considered the tasks that Price performed on each deal and assessed the "value add" of Price's contribution. *Id.* She explained that "value add" is the importance of a broker's contribution to the three crucial phases of a deal: (1) finding the client; (2) gaining control of the client and getting hired; and (3) implementing the transaction. *Id.* With respect to the third factor—implementing the transaction—she testified that there are numerous critical tasks, such as surveying opportunities in the market, reviewing the financial components of the transaction, managing the relationship with the client, preparing lease documents, negotiating price and other terms, reviewing the lease documents, and preparing offer letters. *Id.* With the exception of the deal that Price originated, Reingold determined that Price performed mostly support tasks that, while time consuming, were not instrumental to originating the deals, securing the deals, or implementing the deals. *Id.*

### G. *Price's Reaction to Reingold's Decision*

38. When Price received Reingold's decision, he was "dumbfounded" and "very, very angry, very upset." Price Test. at 225:6–7. He approached Brown, Spiegelman, Waggner, Harbert, Marano, and Ken Goldstein ("Goldstein")[11], to voice his feeling that the decision was unjust. Price Test.

39. Reingold eventually moved Price's office from the tenth floor, where Podell and Brown were located, to the eighth floor because Price's refusal to accept her decision had become disruptive. Reingold Test. Price's agitated, erratic behavior in meetings with Reingold left her disturbed and concerned for her own safety. *Id.* Other staff members had also complained that he had become a disturbance. *Id.* In particular, an administrative assistant named Michelle Antley and a retail services director named Deborah Fisher complained to Brown that Price's attempts to discuss the commission dispute with them interfered with their work. Brown Test. at 1079:14–25. Waggner testified that, even before Reingold's decision, Price would linger outside Waggner's doorway hoping to discuss the dispute with him while Waggner was engaged in meetings or phone calls; Waggner even closed the door in Price's face on some occasions in order to preserve the confidentiality of the proceedings in his office. Waggner Test.

40. C & W management informed Price that he could appeal Reingold's determination to Harbert, and Price decided to do so. Price Test. Harbert met multiple times with Price and discussed the decision with Reingold. Harbert Test. While Harbert was in the process of considering the appeal, Price came to Harbert's office complaining that he had not

---

**11.** Goldstein, assistant general counsel for C & W, testified as a witness for Defendants.

been paid the fifty percent commission that Reingold determined he was owed on the deal he originated. *Id.* Price told Harbert that there was no reason the money should be withheld because he was not appealing Reingold's decision as to that transaction. *Id.* Harbert testified that "it was a very short meeting. He stood over my desk and yelled at me." Harbert Test. at 1187:23–24. Harbert ultimately denied Price's appeal and informed Price that he thought Reingold's decision was fair. Harbert Test.

41. Price also repeatedly approached Marano to complain that Reingold's decision was unfair. Marano Test. Marano told Price that he should voice his concerns through the proper channels, but Price continued to approach Marano about the issue, sometimes in the hallway and sometimes in Marano's office. *Id.*

**H. Price's Termination**

42. In October 2006, Marano informed Reingold that he was disturbed by a conversation he had with Price and was displeased that Price continued to approach him nearly four months after Reingold's decision despite being told multiple times to let the matter go. Reingold Test. Marano expressed concern about the impact Price's behavior was having on the health of the organization, and he left it to Reingold to take whatever next steps were appropriate. *Id.* Reingold interpreted this as an instruction to terminate Price's employment. Reingold Test. at 1249:20–1250:5; 1269:19–1270:1.[12] After this conversation, Reingold reviewed Price's "pipeline"—a database that shows the status of each broker's pending deals—and determined that his production had been limited

since leaving Podell's team and showed little sign of improving. *Id.* Reingold balanced Price's limited production against his ongoing, outspoken discontent over the commission issue and determined that Price's production did not justify the continued disruptions likely to result from keeping him employed. *Id.*

43. On October 23, 2006, Price was notified in a meeting with Goldstein, Waggner, and Carol Giardina, a manager in Human Resources, that his employment at C & W had been terminated. Price Test.

**I. Alleged Acts of Religious Discrimination**

44. When Price's son Noah was diagnosed with a malignant brain tumor, Price became increasingly religious and joined a branch of Judaism called Chabad. Price Test. He became stricter in his religious practices—keeping kosher, learning Hebrew, going to temple and praying more often, and engaging in various other Chabad rituals that he believed would help heal Noah and/or ensure that he was reunited with Noah in the afterlife. *Id.*

45. Price's religiosity manifested itself in several ways in the workplace, and Price testified that Podell displayed animosity towards this outward religiosity in the following ways: (a) Podell described as "barbaric" a Chabad ritual called Kapparot, wherein participants wave live chickens above their heads before the chickens are slaughtered and donated to charity; (b) Podell ordered Price to remove three Hebrew prayer books from the wall of his cubicle; (c) Podell sent Price work e-mails on Rosh Hashanah mere days after Noah's death despite Price's express request that she not do

12. There was some degree of discrepancy between the testimony of Marano and Reingold as to whether Marano instructed Reingold to fire Price or whether Reingold simply understood Marano's expressions of displeasure at Price's conduct as an indication that she should review whether his continued employment was appropriate.

so, and then upbraided him for complaining; (d) Podell told Price that she would not take him to meetings during the mourning period after Noah's death when he was religiously forbidden from shaving; (e) when Price arrived later than usual after attending morning prayer services one morning in late 2005, Podell rebuked him, forbade him from attending morning services in the future, and threatened to terminate him if it happened again (hereinafter, the "Temple Incident"); (f) Podell interrupted Price on two occasions when he was praying in his cubicle; (g) Podell refused to allow Price to hang a religious ornament called a mezuzah in his cubicle; (h) and Podell chastised Price for discussing Chabad with a customer from Singapore. Price Test. As corroborating evidence, Plaintiff's rabbi, wife, and psychiatrist testified that Plaintiff informed them of some or all of these incidents around the time they occurred.

46. By contrast, Podell testified that each of these events either did not occur at all or occurred in a substantially different manner than Price claims. Podell testified that: (a) Price did tell her that he had participated in Kapparot, and that she expressed a dislike for treating animals in that way but did not call the practice "barbaric"; (b) she never saw any prayer books at Price's cubicle, much less told him to remove them; (c) she sent Price e-mails over Rosh Hashanah but did not expect him to read them or respond during the holiday and did not criticize him for not doing so; (d) she did not criticize Price for not shaving after Noah's death, but rather for not shaving on a different day when he had come directly to work after spending the night at the hospital; (e) she was upset with Price on the day of the Temple Incident because she needed to reach him, he did not notify her that he would be arriving later than he usually did after morning prayer services, and he did not turn on his cell phone after leaving temple—she did not threaten to fire him or forbid him from attending morning services in the future, but rather asked him to turn on his cell phone thenceforth when en route from temple to the office; (f) she was not even aware that Price prayed in the office and thus did not interfere with his doing so; (g) Price never asked her if he could hang a mezuzah in his cubicle; and (h) she never scolded Price for discussing Chabad with a client.

47. The Court finds Podell's testimony more credible than Price's testimony as to the incidents enumerated above. Evidence lending credibility to Podell's version of events includes the following:

a. Podell had accommodated Price's religious needs on prior occasions. Price had been attending morning prayer services for about six months before the Temple Incident, and Podell had not complained. Price Test. Price left work early on Fridays, and Podell did not complain. *Id.* Price took off from work to observe several Jewish holidays over the course of each year, without complaint from Podell. *Id.*

b. Price testified that he reported Podell's discriminatory conduct to Ben–Ezra, Marano, Harbert, Brown, and Reingold, in addition to other brokers and staff in the office C & W. However, each of these individuals credibly testified at trial that Price complained to them only about his commission dispute with Podell and not about any acts of religious discrimination.

c. Price prepared two formal memoranda, with the help of an attorney, in which he set forth the details of his commission dispute with Podell.[13] Exs. P–171,

13. Price submitted one memorandum to Reingold prior to the issuance of her decision

P–175. Despite the fact that Price alleges that Podell breached their commission agreement because of her animosity towards Price's religion, Price made no mention whatsoever of this alleged discrimination in either memorandum. He testified that he was reluctant to do so because he did not want to "shake the apple tree" and risk not getting paid the money he believed he was owed. Price Test. at 217:2–3. The Court does not find Price's testimony on this point to be credible.

## IV. CONCLUSIONS OF LAW

### A. Contract-related Claims

#### 1. Price's Contract Claim against Podell

■ Under New York law, the elements of a breach of contract action are "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages." *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC,* 83 A.D.3d 804, 921 N.Y.S.2d 260, 264 (2011).

■ For the reasons set forth in paragraphs 22 through 27 of the findings of fact above, the Court finds that Price has failed to prove the existence of a contractual agreement with Podell guaranteeing him twenty percent of her business. Accordingly, the Court finds that Podell is not liable for breach of contract.

#### 2. Price's Unjust Enrichment Claim against Podell

■ To prevail on an unjust enrichment claim under New York law, "a plaintiff must establish: (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000). The measure of damages for an unjust enrich-

ment claim is restricted to the "reasonable value" of the benefit conferred upon the defendant. *Giordano v. Thomson,* 564 F.3d 163, 170 (2d Cir.2009).

■ Here, the Court finds that Plaintiff received, pursuant to Reingold's determination, the reasonable value of the benefit he conferred on Podell in the disputed transactions. Reingold is a real estate professional with over thirty years of experience. Both Price and Podell submitted documentary evidence to Reingold, which Reingold thoroughly reviewed. Reingold testified at length about the criteria she used on determining the "value add" that Plaintiff's work contributed to the disputed transactions. Although Plaintiff sought to establish that Reingold was biased towards Podell in rendering her decision, the Court finds no evidence of such bias. Moreover, at Price's request, Harbert reviewed Reingold's decision, discussed with Reingold the manner in which she reached the decision, and ultimately agreed that the decision was a fair one.

The evidence presented at trial as to Price and Podell's respective roles in each disputed transaction buttresses the conclusion that Price was adequately compensated for his labor. While there were some discrepancies between Price's testimony and Podell's testimony as to the tasks Price performed on each deal, the weight of the evidence showed that Price's primary role was gathering and compiling information and performing other support functions at Podell's specific request. This is consistent with the undisputed fact that Price and Podell agreed to an arrangement whereby Podell would teach Price the business of real estate leasing and Price would assist Podell while simultaneously learning the trade.

and one to Harbert when he appealed Reingold's decision.

For the foregoing reasons, the Court finds that Plaintiff received the reasonable value of the benefit his work conferred on Podell. Accordingly, his claim for unjust enrichment fails.

### 3. Price's Breach of Contract Claim Against C & W

██ Price alleges that C & W breached his Employment Contract by resolving his commission dispute with Podell via Reingold's management decision instead of allowing him to submit the matter to in-house arbitration. The Court previously determined that the Contract is ambiguous in so far as Paragraph 7 of the Contract and Article VII of the attached Schedule of Compensation appear to provide conflicting mechanisms for the resolution of commission disputes. *See* Sep. 7, 2011 Order at 47, 808 F.Supp.2d at 700–01. However, even assuming without deciding that Plaintiff had a right to arbitration, and that C & W breached the Employment Contract by denying him that right, Plaintiff has failed to prove an essential element of a breach-of contract-action, namely, that any damages resulted from the breach. *See Palmetto*, 921 N.Y.S.2d at 264. Price's claim presupposes that if the dispute had gone to arbitration, then he would have received a greater award than that which Reingold's determination provided him. But that conclusion requires undue speculation. An arbitral panel may just as well have decided that Plaintiff was due less than Reingold determined; indeed, Price may even have been required to pay the costs of the arbitration in the event that he was deemed the losing party. There is simply no basis upon which the Court may conclude that C & W's alleged breach caused Price to suffer damages. *See Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 110 (2d Cir.2007) ("[D]amages must be not merely speculative, possible, and imaginary, but they must be *reason-* *ably certain* and such only as actually follow or may follow from the breach of the contract"). Accordingly, Plaintiff's claim for breach of contract against C & W fails.

### B. *Discrimination Claims*

As set forth in section I, *supra*, Price asserts discrimination claims under Title VII and parallel state and city laws. He asserts four different bases for recovery under these laws: (1) adverse employment action; (2) hostile work environment; (3) failure to accommodate, and (4) retaliation.

#### 1. *Applicable Legal Framework*

Title VII provides that ["i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion ...." 42 U.S.C. § 2000e–2(a)(1). The term "religion" is defined to include "all aspects of religious observance and practice, as well as belief ...." 42 U.S.C. § 2000e(j). Courts have traditionally applied the same standards to Title VII, NYSHRL, and NYCHRL discrimination claims. *See Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316, 786 N.Y.S.2d 382, 819 N.E.2d 998 (2004). However, the Local Civil Rights Restoration Act of 2005 now requires a more liberal interpretation of the city law than its federal and state counterparts in some respects. *See Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27 (1st Dep't 2009) (NYCHRL serves "uniquely broad and remedial purposes, which go beyond those of counterpart State or federal civil rights laws") (internal citation omitted).

██ Title VII, NYSHRL, and NYCHRL claims are generally analyzed under the three-step, burden-shifting framework articulated by the Supreme

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[14] *See Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005); *see also Forrest*, 3 N.Y.3d at 316–317, 786 N.Y.S.2d 382, 819 N.E.2d 998 (applying *McDonnell Douglas* framework to NYSHRL and NYCHRL). Under *McDonnell Douglas*, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Once the plaintiff establishes a prima facie case of discrimination, a rebuttable presumption of unlawful discrimination arises. *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 215 (2d Cir.2006). The defendant, then, has the opportunity to rebut the presumption by establishing a legitimate, non-discriminatory reason for the allegedly discriminatory action. *McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. 1817. If a legitimate, non-discriminatory reason is established, then the burden shifts back to the plaintiff to prove that the reasons provided by the defendant are a pretext for discrimination. *McPherson*, 457 F.3d at 215.

### 2. *Price's Disparate Treatment Claim*

 "A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. State of New York*, 366 F.3d 138, 149 (2d Cir.2004).[15] Here, Plaintiff proceeds on both theories.

### a. *Adverse Employment Action*

 Under Title VII and its parallel state and city statutes, an employee may sue on the theory that the employee was subjected to an adverse employment action due to the employee's religion. *See, e.g., Feingold*, 366 F.3d at 152. Under Title VII, "adverse employment action" is defined as a "materially adverse change" in the terms and conditions of employment, which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir.2004). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* By contrast, under the NYCHRL, there is no requirement that an adverse employment action be "materially adverse" to the plaintiff. *Joseph v. New York City Dep't of Correc.*, No. 10–CV–1265, 2011 WL 1843162, at *9 (E.D.N.Y. May 13, 2011). All that is required is that the adverse action be more than "petty slights or trivi-

---

**14.** As the Court noted in its Sept. 7, 2011 Order, there are "rare exceptions" where Title VII discrimination claims are analyzed under a different "mixed motive" framework instead of the *McDonnell Douglas* framework. Sep. 7, 2011 Order at 19, 808 F.Supp.2d at 687. The Court explained that mixed motive analysis is only proper where there is direct "smoking gun" evidence of discrimination, which the Court found was not present in this case. *Id.* at 20, at 688. The Court held that this case would proceed using the *McDonnell Douglas* framework. *Id.*

**15.** The elements of a disparate treatment claim are the same under the NYSHRL and NYCHRL as well, *Forrest*, 3 N.Y.3d at 324, 786 N.Y.S.2d 382, 819 N.E.2d 998, although the NYCHRL uses a more expansive definition of "adverse employment action," as set forth below. *See Williams*, 61 A.D.3d at 80, 872 N.Y.S.2d 27.

al inconveniences." *Williams*, 61 A.D.3d at 80, 872 N.Y.S.2d 27.

■ To establish a prima facie case of disparate treatment on an adverse employment action theory, Plaintiff must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Feingold*, 366 F.3d at 152–53.

Plaintiff has satisfied the first two elements required to make a prima facie showing of discrimination. He is a member of a protected category, having alleged discrimination on the basis of his religion. *Id.* at 152. He has also demonstrated that he was qualified for the position he held.

As for the third element, Plaintiff argues that he suffered seven adverse employment actions: (1) Podell's abandonment of the 80/20 commission sharing arrangement; (2) the "forced departure of Price from Podell's retail team"; (3) C & W's failure to follow up on Price's claims of discrimination; (4) Podell's interference with his morning prayers at the Chabad temple; (5) Reingold's management decision regarding the commission dispute; (6) Price's move to the eighth floor; and (7) Price's termination.[16] See Pl.'s Trial Br. at 29.[17]

As an initial matter, the first four actions enumerated above cannot serve as adverse employment actions in support of Plaintiff's claim because Plaintiff has failed to meet his burden of proving that the actions occurred. First, as explained above, the Court finds that Plaintiff has failed to prove the existence of an 80/20 commission sharing agreement. Second, Price's allegation that he "was forced" from Podell's team is predicated on the contention that Podell breached an 80/20 commission sharing agreement. Third, based on the Court's findings of fact in paragraph 47, the Court concludes that Price failed to prove by a preponderance of the evidence that he complained to C & W management of discrimination. Fourth, the Court finds Podell's account of the Temple Incident more credible than Price's.

■ The Court need not address whether the remaining three incidents— Reingold's management decision, Price's move to the eighth floor, or Price's termination[18]—are adverse employment actions because the Court finds that Plaintiff has failed to show that these events occurred under circumstances giving rise to an inference of discriminatory intent. Reingold made the decisions behind all three events. Price produced no evidence that Reingold harbored animosity towards his religious beliefs or that her decisions on these mat-

---

**16.** Price's adverse employment action claim as to some of these alleged incidents was dismissed under Title VII and the NYSHRL in the Court's September 7, 2011 Order. However, because all of the alleged incidents remain under city law, the Court addresses each of them here.

**17.** In his brief, Plaintiff states that this Court determined its September 7, 2011 Order that these seven actions, if proved at trial, would constitute adverse employment actions under the NYCHRL. Pl.'s Trial Br. at 29. Plaintiff

misconstrues the Court's holding. The Court did not rule on whether the actions were adverse under city law because Defendants failed to address that issue. It was because Defendants did not address the NYCHRL standard that the Court denied summary judgment on Plaintiff's city law claim as to all seven allegedly adverse actions. *See* Sep. 7, 2011 Order at 30, 808 F.Supp.2d at 689–92.

**18.** Of course, Price's termination constitutes an adverse employment action as a matter of law. *See Feingold*, 366 F.3d at 152

ters were influenced by any religious bias ostensibly held by others.

Moreover, Reingold provided legitimate, non-discriminatory reasons for each of her actions. She credibly testified, in great detail, about the methodology she used to reach her decision on the commission dispute, and Price offered no evidence to suggest that his religion played a role in her determination. She also credibly testified that Price was moved to the eighth floor because of complaints about his disruptive behavior. Harbert, Marano, and Brown's testimony corroborate Reingold's testimony that Price's refusal to accept her management decision had become a disturbance in the office. Lastly, Reingold credibly testified that Price was terminated because his incessant complaints about the commission dispute had become disruptive in the workplace and his minimal production as an independent broker did not justify the organization's continued sufferance of his discontent.

For the foregoing reasons, the Court finds that Plaintiff failed to establish a prima facie case that he was subjected to adverse employment actions because of his religion.

### b. *Hostile Work Environment*

 "When the workplace is permeated with discriminatory intimidation, ridicule, and insult [based on, inter alia, religion] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Proving the existence of a hostile work environment involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that

environment to be abusive." *Feingold*, 366 F.3d at 150 (internal quotations omitted).

 In applying these standards, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). Generally, unless an incident of harassment is sufficiently severe, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted).

 Courts analyze hostile work environment claims under the NYSHRL using the standard applied under Title VII. *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 609 (2d Cir.2006). By contrast, as explained above, the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where [s]tate and federal civil rights laws have comparable language." *Williams*, 872 N.Y.S.2d at 31. The city law does not impose "an overly restrictive 'severe or pervasive' bar" to hostile work environment claims, but defendants can nevertheless "still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 79–80, 872 N.Y.S.2d 27.

 The Court finds that Price has failed to prove that he was subjected to a hostile work environment under federal,

state, or city law standards. Price may indeed have subjectively perceived that he was subjected to a hostile work environment. Given the colossal stress and trauma he was enduring due to the illness and eventual death of his son, it is understandable that he may have perceived relatively innocuous encounters as grave insults rooted in discriminatory animus. However, Price has failed to prove that he was subjected to an objectively hostile or abusive work environment. As explained in paragraph 47 of the Court's findings above, the Court finds Podell's testimony about the allegedly discriminatory acts more credible than Price's. Podell's version of events does not support a finding that Price was subjected to discriminatory acts "severe or pervasive enough to create an objectively hostile or abusive work environment." *See Feingold*, 366 F.3d at 150. While Podell did send Price emails on Rosh Hashanah, ask him to turn on his cell phone when en route to the office after morning prayers, and express distaste for the Chabad ritual of Kapparot, the Court finds that these incidents do not rise above the level of "petty slights and trivial inconveniences" and therefore do not give rise to a hostile work environment even under the liberal NYCHRL standard. *See Williams*, 872 N.Y.S.2d at 31.

### 3. *Price's Failure to Accommodate Claim*

■ Plaintiff's claim for failure to accommodate remains under city law only. *See* Sep. 7, 2011 Order at 55, 808 F.Supp.2d at 695. In order to make out a prima facie case of religious discrimination based on a failure to accommodate, Price must show: (1) he has a bona fide religious belief that conflicts with an employment requirement; (2) he informed the employer of his belief; and (3) he was disciplined for failure to comply with the conflicting employment requirement. *Stavis v. GFK*

*Holding, Inc.*, 769 F.Supp.2d 330, 335 (S.D.N.Y.2011). Plaintiff alleges that Defendants failed to provide him with a reasonable accommodation of his request to attend the Chabad temple before work to pray the Kaddish, which he believed was necessary to honor and keep in close contact with his dead son. Pl.'s Trial Br. at 38. Price argues that Podell's actions on the day of the Temple Incident forced him to choose between losing his job or losing touch with the religious community that was sustaining him. *Id.*

■ Yet again, Price's claim fails because the Court finds Podell's account of the Temple Incident more credible than Price's. Prior to the incident, Price had attended morning prayers for over six months with no complaints from Podell. The Court does not find credible Price's testimony that Podell forbade him from attending morning prayer services in the future and threatened to cut him from her team merely because he arrived fifteen minutes later than usual on the day of the incident. It is more plausible in the eyes of the Court that Podell voiced her frustration with not being able to reach Price on his cell phone when she needed him and asked that he turn on his phone in the future when en route from temple to work. The Court thus finds that Price has failed to show that he was subjected to any disciplinary action for attending morning prayer services. Accordingly, he has failed to establish a prima facie claim that Defendants failed to accommodate his religious beliefs.

In fact, the evidence shows that Defendants accommodated Price's beliefs in many ways. Price prayed in his cubicle three or four times per day for about a year, amounting to hundreds of times in total, and yet even according to Price's testimony, he was only disturbed on two of

these hundreds of occasions. Price left work early on Fridays for religious reasons, and Podell did not complain. Price took off from work to observe several Jewish holidays over the course of each year, and Podell did not complain.

#### 4. *Price's Retaliation Claim*

■ In order to "establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Feingold*, 366 F.3d at 156 (internal quotations omitted). Price claims that the following actions were taken in retaliation for his complaints of discrimination: (1) Reingold's denial of Price's request to arbitrate; (2) Reingold's decision about the commission-splitting arrangement; (3) Reingold's decision to move Price to the eighth floor; and (4) Price's termination.

As an initial matter, Price admitted at trial that he actually believed Reingold's decision to resolve the commission dispute herself instead of sending it to arbitration was retaliation for Price having called Podell a liar, not retaliation for Price's religious beliefs. Price Test. at 379:3–380:7. Plaintiff's retaliation claim thus fails with respect to denial of his arbitration request.

■ With regard to Reingold's resolution of the commission dispute, Price's move to the eighth floor, and Price's eventual termination, Plaintiff fails to make a prima facie showing of retaliation because, as previously noted, the weight of the evidence does not support Plaintiff's testimony that he complained of discrimination to C & W management prior to those actions.

Even if Plaintiff could establish a prima facie case of religious discrimination, Defendants have certainly articulated legitimate, nondiscriminatory reasons for taking the actions at issue. *See* Section III(2)(a), *supra.* Plaintiff did not provide convincing evidence that Defendants' stated reasons for the actions were pretextual in nature.

### V. *CONCLUSION*

For the foregoing reasons, the Court finds that Plaintiff Mark B. Price has failed to satisfy his burden of proof as to any of his claims for relief. Accordingly, the Court enters JUDGMENT in favor of Defendants Joanne Podell and Cushman & Wakefield, Inc., on Plaintiff's claims for violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* The Court enters JUDGMENT in favor of Defendant Cushman & Wakefield, Inc., on Plaintiff's claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, *et seq.*, and Plaintiff's claim for breach of contract. And the Court enters JUDGMENT in favor of Defendant Joanne Podell on Plaintiff's claims against her for breach of contract and unjust enrichment.

IT IS SO ORDERED, ADJUDGED, AND DECREED.