# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

RAYTHEON COMPANY,

           Plaintiff,

v.

BAE SYSTEMS TECHNOLOGY
SOLUTIONS & SERVICES INC.,

           Defendant.

)
)
)
)
)C.A. No. N17C-02-079 PRW CCLD
)
)
)
)
)
)

Submitted: August 1, 2017
Decided: October 30, 2017

*Upon BAE Systems Technology Solutions
& Services, Inc.'s Motion to Dismiss,*
**GRANTED as to Counts I, III, V, VI and VII and DENIED as to Counts II
and IV.**

## MEMORANDUM OPINION AND ORDER

Jack B. Jacobs, Esquire, Sidley Austin LLP, Wilmington, Delaware, Mark D. Hopson, Esquire (*pro hac vice*), Gordon D. Todd, Esquire (*pro hac vice*), Daniel J. Feith, Esquire (*pro hac vice*), Sidley Austin LLP, Washington, D.C., Attorneys for Plaintiff.

John A. Sensing, Esquire, Matthew F. Davis, Esquire, Jesse L. Noa, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Gregory M. Williams, Esquire (*pro hac vice*), Richard W. Smith, Esquire (*pro hac vice*), Katherine C. Campbell, Esquire (*pro hac vice*), Wiley Rein LLP, Washington, D.C., Attorneys for Defendant.

**WALLACE, J.**

## I.   INTRODUCTION

Plaintiff Raytheon Company ("Raytheon") brings a Complaint against BAE Systems Technology Solutions and Services, Inc. ("BAE"), in seven counts: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) contractual indemnification; (4) unjust enrichment; (5) negligent misrepresentation (pleaded in the alternative); (6) tortious interference with prospective contractual relations (pleaded in the alternative); and (7) a tort related to damaged trade and profession (pleaded in the alternative). The suit arises from BAE's and Raytheon's relationship and intended concert to upgrade a foreign government's military aircraft.[1]

BAE now moves to dismiss all counts of Raytheon's complaint.[2]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A. SOUTH KOREA'S INITIAL F-16 UPGRADE PROGRAM BIDS.

In 2011, the Republic of Korea's ("South Korea") Defense Acquisition Program Administration moved to upgrade the avionics systems and the mission system software on its military's 134 F-16 fighter jets.[3] The upgrade involved multiple components, including mission computers, mission software, and radar

---

[1]    Pl.'s Second Am. Compl. ¶¶ 139–187 [hereinafter Pl.'s Compl.].

[2]    Opening Br. in Supp. of Def.'s Mot. to Dismiss at 1 [hereinafter Def.'s Br.].

[3]    Pl.'s Compl. ¶ 29.

systems. Before entering into the Foreign Military Sales program ("FMS Program")—through which the United States Government buys defense articles or services from United States contractors on behalf of foreign end users[4]—South Korea conducted a competitive bidding process on its own.[5] South Korea solicited bids from BAE and Lockheed Martin to "perform the task of integrating the upgraded avionics systems into the aircraft, and separately solicited bids from Raytheon and Northrop [Grumman] to supply the radar units."[6]

To help prepare its South Korean bid, Raytheon retained John Bean as a consultant.[7] Bean is a former Lockheed Martin employee with significant F-16 experience. Bean oversaw and assumed responsibility for Raytheon's bid development. His contract with Raytheon explicitly prohibited him from doing

---

[4] The FMS Program is authorized by the Arms Export Control Act, 22 U.S.C. § 2751, *et seq.* FMS Program contracts must be executed without any cost to United States taxpayers, and the foreign end user is required to pay all of the program costs. As such, the United States Government, not the individual United States contractor, sets the price to be charged to the foreign end user. This results in no direct contractual relationship between the United States contractor and the foreign end user. To begin the process, the foreign end user submits a letter of request to the United States Government, asking to purchase specific things. The two governments then negotiate and enter into a Letter of Offer and Acceptance ("LOA"). Following this agreement, the United States Government typically selects vendors to provide the requested goods. The foreign end user may request certain contractors. The main contractor can then enter subcontracts as needed to obtain materials, etc., to fulfill the contract it has with the United States Government. The FMS program itself prevents a foreign end user from bringing a suit against the United States contractor in relation to the FMS program transaction.

[5] *Id.* ¶ 30.

[6] *Id.*

[7] *Id.* ¶ 31.

-3-

anything that would create a conflict of interest without informing Raytheon. It also prevented Bean from "represent[ing] a competitor on any particular matter in which Raytheon [was] involved."[8] Raytheon claims that while Bean was under this contract, he consulted with BAE on its negotiations with the United States Government for the South Korean FMS contract.[9] Raytheon and BAE bid separately to participate in their respective aspects of the program.

In August 2012, South Korea selected BAE as its preferred systems integrator and entered into an agreement with the company.[10] That agreement included a price of $536 million and a requirement that BAE use its best efforts to integrate that price into an LOA with the United States Government.

Raytheon alleges that as soon as South Korea selected BAE, Raytheon's employees met with BAE's F-16 team to understand the system architecture in which its radar would be integrated.[11] At this point, Bean informed Raytheon of his potential conflict of interest and "theretofore undisclosed work for BAE."[12] BAE then hired Bean as "Vice President" and "General Manager for Global Fighter

---

[8]     *Id.* ¶ 32.

[9]     *Id.*

[10]    *Id.* ¶ 33.

[11]    *Id.* ¶ 34.

[12]    *Id.* ¶ 35.

Programs."[13] Raytheon says Bean's duties with BAE then included coordinating with Raytheon and overseeing Raytheon's work on the South Korean program. Raytheon terminated Bean's consulting contract with it, but says, by then, Bean was already in a position to, and did in fact, use his insider knowledge of Raytheon to influence Raytheon's bid to benefit BAE and disadvantage Raytheon.[14]

In April 2013, South Korea selected Raytheon as its preferred radar supplier, and entered into an agreement with it.[15] That agreement included a firm fixed price of $357,987,453 and an agreement to use its best efforts to reflect that understanding in an LOA with the United States Government. It also required Raytheon to maintain a bid bond for $17,899,373 to South Korea against failure to do so.[16]

## B. SOUTH KOREA NEGOTIATES WITH THE UNITED STATES GOVERNMENT FOR AN FMS CONTRACT.

South Korea originally sought two separate FMS contracts with the United States Government. On August 1, 2012, South Korea submitted a request for the systems integration portion of the upgrade, designating BAE. On April 8, 2013, South Korea submitted a separate request for the radar portion of the upgrade,

---

[13]     *Id.* ¶ 36.

[14]     *Id.* ¶ 37.

[15]     *Id.* ¶ 38.

[16]     *Id.* ¶ 39.

designating Raytheon.[17]   The United States Government urged South Korea to submit a single request covering both; South Korea did so on September 17, 2013.[18] That combined request designated BAE as the systems integrator and prime contractor, with Raytheon as a subcontractor to BAE.[19]   BAE asserts it did not request this arrangement; rather, the United States Government directed this.[20]

Upon receiving that combined request, the United States Government began to evaluate how much such a request would cost South Korea.  The United States Air Force estimated that the entire cost (including an increase for risk level) was between $2.15 and 2.2 billion.[21]   South Korea objected to this estimate.  But, in response, South Korea did agree to remove certain elements from its requested program.  This reduced the estimated cost to $1.86 billion.[22]   South Korea still objected to the price quotes.

---

[17]     *Id.* ¶ 41.

[18]     *Id.* ¶ 42.

[19]     *Id.*

[20]     Def.'s Br. at 8.

[21]     Pl.'s Compl. ¶ 45.

[22]     *Id.* ¶ 46.

In September 2013, the United States Government, South Korea, and BAE "tentatively" agreed to a total estimated cost of $1.705 billion.[23] Approximately $1.3 billion of that price was attributed to BAE's and Raytheon's combined costs, with the balance covering the United States government's administrative costs.[24] The United States Air Force warned South Korea that there was a "high cost risk" and that "there [was] no guarantee[] that future funding [might] not be required during program execution."[25] Raytheon alleges it was informed of neither South Korea's cost concerns nor the Air Force's warning regarding cost risk.[26]

The program was eventually split into two LOAs: LOA-1 and LOA-2. LOA-1 covered the limited work necessary for initial design and development of the upgrades, while LOA-2 covered actual production and integration of the systems.[27]

On December 13, 2013, the United States Government and South Korea executed LOA-1. South Korea agreed to pay the United States approximately $185 million immediately.[28] The United States Government did not issue the prime

---

[23] *Id.* ¶ 48. Defendants allege Raytheon agreed to this price estimate as well. *See* Def.'s Br. at 8.

[24] Pl.'s Compl. ¶ 48.

[25] *Id.* ¶ 49.

[26] *Id.* ¶ 50.

[27] *Id.* ¶ 51; Def.'s Br. at 8.

[28] Pl.'s Compl. ¶ 52.

contract to BAE until May 2014.[29] Meanwhile, both governments continued to negotiate LOA-2.

### C. BAE SUBCONTRACTS WITH RAYTHEON.

Even though BAE did not yet have the prime contract with the United States Government, BAE subcontracted with Raytheon on December 31, 2013.[30] Raytheon alleges that this Subcontract went beyond the limited scope of LOA-1, and included Raytheon's performance for the entire upgrade program.[31] Raytheon claims that BAE made statements during the Subcontract negotiations that "were intended to induce Raytheon to enter the Subcontract and begin work on and invest its own funds in the program immediately."[32]

BAE, however, says that the Subcontract was "undefinitized" and was not fully funded.[33] Until that occurred, BAE was only incrementally authorizing and funding certain activities,[34] and was not obligated to reimburse Raytheon for any

---

[29]  *Id.* ¶ 53; Def.'s Br. at 8.

[30]  Pl.'s Compl. ¶ 55.

[31]  *Id.*

[32]  *Id.* ¶ 56.

[33]  Def.'s Br. at 9 (citing Pl.'s Compl. Ex. 1 at §§ III(D) ("Until such time that this UCA is fully funded at contract definitization. . . ."); III(E)(b); & III(E)(d)).

[34]  Def.'s Br. at 9 (citing Pl.'s Compl. Ex. 1 at § III(E)(a)).

amount over that which was allotted.[35] Further, even for the funded work, BAE could terminate the Subcontract for convenience if doing so was in its "best interest."[36]

Raytheon claims that BAE informed it that BAE lacked resources for the full subcontract immediately, but would secure full funding promptly.[37] Raytheon also claims that BAE represented that the United States Government and South Korea would finalize the LOA-2 soon.[38] Raytheon says BAE never disclosed the ongoing issues.

### D. THE SUBCONTRACT LANGUAGE.

*1. General Terms*

The Subcontract is titled "Undefinitized Contract Action." Raytheon asserts that these are standard in United States government contracting.[39] They allow the contractor to begin work with a payment guarantee, while realizing that some of the specific terms are not yet final.[40]

---

[35]      *Id.* (citing Pl.'s Compl. Ex. 1 at § III(E)(b)).

[36]      *Id.* (citing Pl.'s Compl. Ex. 1 at UCA_00026).

[37]      Pl.'s Compl. ¶ 58.

[38]      *Id.*

[39]      *Id.* ¶ 61.

[40]      *Id.*

The Subcontract states

> This UCA constitutes an agreement between the parties on the terms and conditions set forth herein and signifies the intention of the parties to execute a form, definitive <u>Firm Fixed Price</u> type Agreement for the supplies/services described in Attachment 1, Supplies/Services, Prices, and Delivery Schedule, hereto consistent with the terms and conditions as specified in Attachment 2, UCA Terms and Conditions.[41]

*2. Funding*

As to the incremental funding, the Subcontract goes on

> [BAE] has informed [Raytheon] that insufficient funding is available to support the program execution schedule prior to August 2014. At [Raytheon's] sole discretion, [Raytheon] may establish internal funding to assist the program in maintaining price and schedule. If and when sufficient funding is established on the Contract, these internally funded [Raytheon] costs shall be reimbursable under the Contract.[42]

Under the terms of the funding schedule, BAE was to pay Raytheon $2.7 million in initial funding, $24.8 million on March 31, 2014, and be "fully funded in accordance with Attachment 11 [monthly funding schedule]."[43] Raytheon claims that these provisions regarding incremental funding made BAE "responsible for

---

[41]  Pl.'s Compl. Ex. 1 at UCA_0004.

[42]  *Id.* at UCA_0009.

[43]  *Id.*

-10-

reimbursing Raytheon's full performance."[44] It claims "the Subcontract required BAE to allot funds and pay Raytheon even in the absence of a Government contract."[45]

### 3. Termination

The Subcontract also contains termination provisions. Section VI(C) allows BAE to terminate the Subcontract for convenience if "the parties fail to agree or fail to make progress to reach an agreement on terms and conditions of a definitive Agreement" or "the differences . . . are not resolved within the time specified for definitization."[46] The Subcontract could also terminate automatically if the parties didn't execute a definitive agreement by the cutoff date.[47] Either way, "[Raytheon] shall be reimbursed with the termination for convenience clause indicated below, but not in excess of the maximum BAE [not-to-exceed provision of the Subcontract]."[48]

The Terms and Conditions in Attachment 2 to the Subcontract incorporate a number of Federal Acquisition Regulation ("FAR") provisions, including the

---

[44]     Pl.'s Compl. ¶ 72.

[45]     *Id.* ¶ 73.

[46]     Pl.'s Compl. Ex. 1 at UCA_00013.

[47]     *Id.*

[48]     *Id.* at UCA_00013–00014.

termination procedure "entitled Termination for the Convenience of the Government set forth in FAR 52.249-2 (Apr. 2012)."[49] Under that regulation, after receiving notice of termination from the United States Government, the prime contractor must immediately terminate all related subcontracts.[50] This procedure prevents recovery of future lost profits by the prime contractor.[51]

### 4. Customer Communications Provision

Section 5 of the Terms and Conditions states

> With the exception of System Integrity, for which Raytheon shall be allowed to directly liaison and coordinate with the [United States] Government, [BAE] shall be solely responsible for all liaison and coordination with [South Korea], any higher tier contractor(s), or the [United States] Government, as it affects any applicable prime contract, this Contract, and any related contract. Except as required by law, [Raytheon] shall not communicate with [South Korea], any higher tier contractor(s), or the [United States] Government, with respect to the applicable prime contract or this Contract without prior written approval from [BAE]. . . .[52]

---

[49] *Id.* at UCA_00026 (§ 31(a)(i)). The Federal Acquisition Regulation is codified at 48 C.F.R. c. 2-99 (2013).

[50] Def.'s Br. at 11 (citing FAR provisions).

[51] *See G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426–27 (Ct. Cl. 1963) ("For many years unearned profits have not been paid upon such terminations, and we think it probable, too, that Centex-Zachry knew of that general policy. For all of these reasons, we believe that it is both fitting and legally sound to read the termination article required by the Procurement Regulations as necessarily applicable to the present contract and therefore as incorporated into it by operation of law. It follows that Centex-Zachry and its subcontractors cannot recover unearned but anticipated profits.").

[52] Pl.'s Compl. Ex. 1 at UCA_00021.

The parties dispute whether this provision imposes merely a restriction on Raytheon's ability to communicate with the United States Government and South Korea, or actively places a duty on BAE to liaise and coordinate with the two countries on Raytheon's behalf.[53]

### 5. *Indemnification of Third-Party Claims*

Section 29 of the Terms and Conditions addresses indemnification. It states

> [BAE] and [Raytheon] indemnify each other against third party claims to the extent directly caused and proportionate to the negligence of the indemnifying party. [Raytheon] shall indemnify, hold harmless, and at [BAE]'s election, defend [BAE] . . . from and against all losses, claims . . . causes of action . . . including, but not limited to, reasonable attorneys' fees, [litigation and settlement expenses], and court costs, to the extent directly caused and proportionate to the negligent acts or omissions of [Raytheon] . . . related to the execution of work to be performed or otherwise in the performance of its obligations under the contract. [BAE] shall indemnify, hold harmless and, at Raytheon's election, defend Raytheon . . . from and against all losses, claims . . . causes of action . . . including, but not limited to, reasonable attorneys' fees, [litigation and settlement expenses], and court costs, to the extent directly caused and proportionate to the negligent acts or omissions of [BAE] . . . related to of the execution of work to be performed or otherwise in the performance of its obligations under the contract.[54]

---

[53] Def.'s Br. at 11–12 ¶ e ("The provision placed no obligations on [BAE]"); Pl.'s Compl. at ¶ 81 ("The first sentence [of the provision] gives BAE the right and obligation to be exclusively responsible for all communications with the Sovereigns regarding the [Program].").

[54] Pl.'s Compl. Ex. 1 at UCA_00026.

In short, to be triggered, this clause requires three things: (1) a claim brought by a third party; (2) which is "directly caused and proportionate to the negligence of the indemnifying party;" and which is (3) "related to . . . the execution of work to be performed or otherwise in performance of the [indemnifying party's] obligations."

### E. UNITED STATES GOVERNMENT TERMINATES LOA-1.

In early October 2014, South Korea requested a partial stop work order for LOA-1. On October 15, 2014, BAE told Raytheon to stop all work: Raytheon complied.[55] At the time of the stop work order, Raytheon had spent $38.602 million of internal funds on the Subcontract "in reliance on BAE's repeated misrepresentations that it was close to securing the full funding for the Upgrade Program and would reimburse Raytheon for its investment."[56] Raytheon alleges that despite having received sufficient funds to reimburse it, BAE only paid Raytheon $26.044 million of that figure.[57]

On October 15, 2014, BAE asserted that the maximum funding and termination liability under the subcontract was $38,355,458.[58] After that was split

---

[55]     Pl.'s Compl. ¶ 119.

[56]     *Id.* ¶ 120.

[57]     *Id.*

[58]     *Id.* ¶ 121.

-14-

between various Subcontract costs, it would leave Raytheon with almost $6 million in unpaid internal costs.

On November 5, 2014, the United States Government and South Korea terminated LOA-1 because they were unable to agree on the price and scope of the Upgrade Program and of LOA-2.[59] Raytheon alleges that BAE withheld information about all the issues and negotiations between the United States Government, South Korea, and BAE up until that point. BAE immediately notified Raytheon of the termination, BAE terminated the Subcontract, and the parties then engaged in termination negotiations.[60]

At an April 2015 negotiation meeting, Raytheon alleges that BAE acknowledged that Bean had been "too positive about the outcome for the Upgrade Program, which had clouded his judgment and soured [BAE]'s relationship with Raytheon."[61] In January 2016, Raytheon and BAE agreed to reallocate available funding to repay Raytheon.[62]

---

[59]  Def.'s Br. at 12.

[60]  *Id.*; Pl.'s Compl. ¶ 123–124.

[61]  Pl.'s Compl. ¶ 124.

[62]  *Id.* ¶ 125

### F. SOUTH KOREA SUES RAYTHEON AND BAE IN SOUTH KOREA.

On July 1, 2015, South Korea filed two separate suits in its home courts against BAE and Raytheon. South Korea claimed that both companies impermissibly raised their prices, resulting in an increase in the FMS price. South Korea said both companies did so in violation of the original agreements made between South Korea and BAE/Raytheon prior to any United States government involvement.[63]

BAE countersued in the Maryland federal district court, seeking a declaration that South Korea could not sue BAE under the FMS Program.[64] In December 2016, that court granted summary judgment in favor of BAE, stating that South Korea's grievance is with the United States Government, not BAE.[65]

---

[63]  *Id.* ¶¶ 130–31; Def.'s Br. at 12.

[64]  Def.'s Br. at 12.

[65]  *Id.* at 12–13.

## G. RAYTHEON'S CHANCERY ACTION IS DISMISSED.

Raytheon brought suit against BAE in the Delaware Court of Chancery in 2016, alleging largely the same claims raised here. The Court of Chancery dismissed the two equitable claims,[66] and Raytheon elected to transfer its case here.[67]

## III. STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Superior Court Civil Rule 12(b)(6), the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[68]

The Court must accept as true all well-pleaded allegations.[69] And every reasonable factual inference will be drawn in the non-moving party's favor.[70] But

---

[66] Order Granting Mot. to Dismiss, *Raytheon Co. v. BAE Sys. Holdings, Inc.*, No. 11957-VCL (Del. Ch. Nov. 30, 2016).

[67] Order Granting Pl.'s Election to Transfer Action to Superior Court, *Raytheon Co. v. BAE Sys. Holdings, Inc.*, No. 11957-VCL (Del. Ch. Jan. 27, 2017).

[68] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[69] *Id.*

[70] *Wilmington Sav. Fund. Soc'y, F.S.B. v. Anderson, et al.*, 2009 WL 597268, at *2 (Del. Super. Ct. Mar. 9, 2009) (citing *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005)).

the Court will "ignore conclusory allegations that lack specific supporting factual allegations."[71]

"Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[72] But, if the Court engages the standards described and finds the claimant may recover, the Court must deny the motion to dismiss.[73]

## IV. CHOICE OF LAW

Raytheon and BAE both agree that New York law governs their relationship due to the choice-of-law clause in the Subcontract.[74] When contracting parties select a particular forum state's law to govern the contract and all matters arising from it, Delaware and New York both hold that the parties' choice of law covers both contract and related tort claims.[75]

---

[71] *Anderson v. Tingle*, 2011 WL 3654531 (Del. Super. Ct. Aug. 15, 2011).

[72] *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004).

[73] *Spence v. Funk & Communication Consultants, Inc.*, 396 A.2d 967, 968 (Del. 1978).

[74] Pl.'s Compl. ¶ 17 (Ex. 1, at 23); Def.'s Br. at 15.

[75] *J.S. Alberici Const. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000); *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1048 (Del. Ch. 2006) ("To hold that [the parties'] choice [of law] is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid."). *See also Triple Z Postal Servs., Inc. v. United Parcel Serv., Inc.*, 2006 WL 3393259, at *9 (N.Y. Sup. Ct. 2006) (holding that where "the resolution of plaintiff's tort claims is inextricably linked to the

-18-

## V. DISCUSSION

### A. BREACH-OF-CONTRACT CLAIM.

In order to state a claim for breach of contract under New York law, Raytheon must allege "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages."[76] Here, Raytheon must plainly plead and show that there was a contractual obligation that BAE breached.[77]

Neither party disputes the validity and enforceability of the Subcontract. The parties instead dispute their obligations under the "undefinitized" Subcontract. Raytheon alleges that BAE failed to fund the Subcontract in accordance with the Subcontract's terms, failed to timely reimburse Raytheon, and improperly terminated the Subcontract. Raytheon further contends that it is entitled to lost profits damages due to BAE's breach.

---

parties' contractual relationship, the contract and its interpretation," it is "encompassed by the [contract's] Forum Selection Clause.").

[76] *Hampshire Props. v. BTA Bldg. & Developing, Inc.*, 122 A.D.3d 573, 573 (N.Y. App. Div. 2014).

[77] *See, e.g., Steinblatt v. Imagine Media, Inc.*, 758 N.Y.S.2d 149, 149 (N.Y. App. Div. 2003) ("Although the plaintiffs claimed that the defendant's failure . . . constituted a breach of contract, they failed to plead the existence of an agreement setting forth an affirmative duty on the part of the defendant. . . .").

-19-

The New York Court of Appeals has stated that "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent[,]" and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing[.]"[78] "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[79] "The threshold question of whether a contract is unambiguous, and the subsequent construction and interpretation of an unambiguous contract, are issues of law within the province of the court."[80] The Subcontract here is complete, clear and unambiguous on its face, and thus will be accorded its plain meaning.

### 1. The Subcontract Contained No Provision Promising Full Payment.

The undefinitized nature of the Subcontract meant that until the contract was "fully funded at contract definitization," BAE's liability was governed by the "Limitation of Buyer's Obligation" provision—which made BAE liable only for

---

[78] *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (quoting *Slamow v. Del Col*, 594 N.E.2d 918 (N.Y. 1992)).

[79] *Id.*

[80] *NRT New York, LLC v. Harding*, 16 N.Y.S.3d 255, 258 (N.Y. App. Div. 2015) (internal citation omitted).

-20-

incrementally authorized and funded activities.[81] Specifically, the Limitation of Buyer's Obligation Provision provides that BAE was not

> obligated in any event to reimburse [Raytheon] in excess of the amount allotted to the contract for those [incrementally funded] item(s) regardless of anything to the contrary in the clause entitled 'Termination for Convenience of the Buyer' unless additional funds are subsequently allotted to the contract.[82]

Raytheon contends that the phrase "unless additional funds are subsequently allotted" means that BAE was solely responsible for allotting funds to the Subcontract. But this reading contradicts the purpose of the provision and would render BAE's obligation limitless. Instead, the plain meaning of the phrase is that if BAE were to allot additional funds to the Subcontract prior to definitization, its liability would be increased correspondingly to cover that amount. This reading is consistent with paragraph (d) of the Limitation of Buyer's Obligation Provision, which contemplates the allocation of additional funds.[83]

Raytheon claims that BAE is obligated to fund Raytheon's work for the entire project, that such obligation was absolute, and that such obligation was neither

---

[81] Pl.'s Compl. Ex. 1 at § III(E)(a) & (b).

[82] Pl.'s Compl. Ex. 1 at § III(E)(b).

[83] Pl.'s Compl. Ex. 1 at § III(E)(d).

contingent on the negotiations finalizing nor the contract definitization.[84] But where in the Subcontract does that obligation arise? Raytheon can't say.

Raytheon alludes to the Estimated Termination Liability Schedule's "full funding" obligation.[85] But Raytheon incants nothing that *requires* BAE to pay a full amount. The mentioned Schedule itself is "estimated" and limits what Raytheon can receive in termination amounts—doing so based upon when termination occurs and what performance had by then been authorized. Too, the Subcontract states that BAE was merely "expected" to provide additional funding in accordance with the schedule.[86]

### 2. Raytheon Spent Internal Funds at its Own Risk.

Raytheon's internal expenses, spent without BAE's authorization and at Raytheon's "sole discretion,"[87] were incurred at Raytheon's risk. The Subcontract states that such internal expenditures were only reimbursable "[i]f and when sufficient funding is established on the Contract[.]"[88]

---

[84]     Pl.'s Compl. ¶¶ 139–47.

[85]     Pl.'s Compl. ¶ 71.

[86]     Pl.'s Compl. Ex. 1 at § III(C).

[87]     Pl.'s Compl. Ex. 1 at § III(B). "At [Raytheon's] sole discretion, [Raytheon] may establish internal funding to assist the program in maintaining price and schedule. If and when sufficient funding is established on the Contract, these internally funded [Raytheon] costs shall be reimbursable under the Contract." *Id.*

[88]     Pl.'s Compl. Ex. 1 at UCA_0009.

If Raytheon seeks to recover its internal funds that were spent post-Subcontract, but prior to any authorization by BAE, and for which the United States Government *has not* provided funding, it is barred by the express language of the contract.

While if Raytheon seeks to recover its internal funds that were spent post-Subcontract, but prior to any authorization by BAE, and for which the United States Government *has* provided funding, it is covered by the termination negotiations. Raytheon concedes that because of the payments made under those negotiations, it has no outstanding unreimbursed costs.[89]

Lastly, if Raytheon seeks recovery of any pre-South Korean project expenses it incurred while trying to develop a radar system, there is no contractual basis for such recovery.

### 3. The Subcontract was Not Impermissibly Terminated.

Raytheon claims that the contract was impermissibly terminated. The Subcontract allowed BAE to terminate on two potential grounds: (1) convenience, or (2) absence of progress towards definitization. BAE could terminate the Subcontract for convenience if doing so was in its "best interest."[90] Raytheon

---

[89]    Pl.'s Compl. ¶ 125; Def.'s Br. Ex. D (Del. Ch. Mot. to Dismiss Hr'g Tr. at 88–90, Nov. 29, 2016).

[90]    *Id.* (citing Pl.'s Compl. Ex. 1 at UCA_00026).

contends that the termination was impermissible because BAE based its termination on the fact that the United States Government terminated its prime contract with BAE, and as such, did not meet the failure to make progress toward definitization requirement.[91] Raytheon goes on to claim that "the Subcontract did not permit BAE to terminate for convenience. . . ."[92] Raytheon's reading is plainly wrong.

BAE could terminate the contract if doing so was in its "best interest," and the Subcontract explicitly says that BAE can terminate for convenience.[93] Failure to make progress toward definitization is not, as Raytheon suggests, a "condition precedent" to termination for convenience. Failure-to-make-progress and convenience are instead alternate (and independent) grounds for termination.

### 4. Raytheon is Not Entitled to Lost Profits.

Raytheon's claim of lost future profits for unperformed LOA-1 work, non-existent LOA-2 work, and potential future work on F-16 upgrade programs with other countries is baseless.

First, lost profits are not permitted under FAR Section 52.249-2.[94] Under that federal regulation, the contractor is only entitled to recover (1) "[t]he contract price

---

[91]     Pl.'s Compl. ¶ 144.

[92]     *Id.*

[93]     Pl.'s Compl. Ex. 1 at UCA_00013.

[94]     Pl.'s Compl. Ex. 1 at UCA_00026 ¶ 31(a) ("Any such termination shall be in accordance with the procedure set forth in the clause entitled *Termination for the Convenience of the*

for completed supplies or services accepted" but not yet paid for; (2) "[t]he costs incurred in the performance of the work terminated;" and (3) "[t]he cost of settling and paying termination settlement proposals;" all with reasonable allowance for profit on work done.[95] "Anticipatory profits and consequential damages shall not be allowed."[96]

Second, "[a] party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty."[97] Nothing indicates that such recovery was contemplated in the Subcontract.

Finally, Raytheon's claim for lost profits is entirely speculative. If the profits a party seeks are "merely speculative, possible or imaginary" they cannot be recovered.[98] Raytheon's cited cases, *American List* and *Tractebel Energy*, in which plaintiffs recovered the entire balance due of multi-year contracts that had been prematurely cancelled, don't help here.[99] Unlike those in *American List* and

---

*Government* set forth in FAR 52.249-2, (Apr. 2012) which clause is incorporated herein by this reference.").

[95]     48 C.F.R. § 52.249-2 (2013).

[96]     48 C.F.R. § 49.202 (2013).

[97]     *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993).

[98]     *Kenford Co v. Erie Cty.*, 493 N.E.2d 234, 235 (N.Y. 1986).

[99]     *See Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161 (N.Y. 1989); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d Cir. 2007).

*Tractebel Energy*, the Subcontract was incrementally funded, awaiting full funding at contract definitization. Only "[i]f and when sufficient funding [was] established on the [c]ontract" would BAE be liable for Raytheon's internal expenses. BAE was "not . . . obligated in any event to reimburse [Raytheon] in excess of the amount allotted to the contract . . . unless additional funds [were] subsequently allotted."[100] Because no additional funds were allotted prior to termination, damages relating to hypothetical future allotments are merely speculative. Raytheon is therefore not entitled to lost profit damages. With these many failures, Raytheon does not, under any reasonable interpretation of the facts alleged, state a breach-of-contract claim under which relief might be granted. And so, its breach-of-contract claim (Count I) must be **DISMISSED**.

### B. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM.

"Under New York law, a duty of good faith and fair dealing is implicit in every contract, but only in connection with rights or obligations originating in the contract."[101] This implied covenant encompasses the idea that "neither party shall

---

[100]    Pl.'s Compl. Ex. 1 at § III(E)(b).

[101]    *Wolff v. Rare Medium, Inc.*, 65 F. App'x 736, 738–39 (2d Cir. 2003).

do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[102]

Raytheon claims that the Consumer Communication provision created an obligation for BAE "to report accurately on Raytheon's performance to [South Korea] and to report information that needed to be conveyed from [South Korea] to Raytheon" because BAE was "solely responsible" for all communications regarding the Subcontract.[103] Raytheon alleges that BAE "breached its obligation by misrepresenting to Raytheon the actual status of the Upgrade Program and by misrepresenting Raytheon's performance and pricing to [South Korea]."[104] Under the language of the provision, Raytheon could not communicate with South Korea or the United States Government as to the status of its performance or anything else related to the LOAs.

BAE contends that the Consumer Communication provision did not impose an obligation on it, but rather a restriction on Raytheon. Where contractual language imposes a restriction on a plaintiff rather than an obligation on the defendant, it cannot serve as the basis of a good faith claim against that defendant.[105] But the

---

[102]    *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008).

[103]    Pl.'s Compl. ¶ 150.

[104]    Pl.'s Ans. at 25.

[105]    *Wolff*, 65 F. App'x at 739.

Subcontract provides that "[BAE] shall be solely responsible for all liaison and coordination with [South Korea]."[106] BAE could therefore be found to have been contractually obliged to manage all liaison and coordination with South Korea, and, under New York law, to do so in accordance with its duty of good faith and fair dealing.

Raytheon's breach of the implied covenant of good faith and fair dealing claim (Count II) survives this Motion to Dismiss.

## C. INDEMNIFICATION CLAIM.

Raytheon contends that under the terms of the Subcontract, BAE must indemnify it for any losses suffered in connection with South Korea's suit against Raytheon. South Korea's suit arises from Raytheon's alleged breach of the radar supply agreement between it and South Korea. Raytheon alleges that BAE's "misrepresentations and omissions caused [South] Korea to mistakenly accuse Raytheon of breaching the [agreement]."[107] BAE argues that Raytheon's claim must fail because it falls outside of the scope of the Subcontract's indemnification clause, and is unrelated to any contractual obligations BAE may have owed Raytheon.

---

[106]    Pl.'s Compl. Ex. 1 at UCA_00021.

[107]    Pl.'s Compl. ¶ 158.

New York law generally disfavors indemnification clauses and, in turn, New York courts apply a strict construction standard to them.[108] A duty to indemnify will only be found if there is an "unmistakable intent[] to indemnify."[109] The indemnity clause in the Subcontract provides:

> [BAE] and [Raytheon] **indemnify each other against third party claims to the extent directly caused and proportionate to the negligence of the indemnifying party.** . . . [BAE] shall indemnify, hold harmless and, at Raytheon's election, defend Raytheon . . . from and against all losses, costs, claims, penalties, causes of action, damages, liabilities, fees, and expenses, including, but not limited to, reasonable attorneys' fees, all expenses of litigation and/or settlement, and court costs, to the extent directly caused and proportionate to the negligent acts or omissions of [BAE] . . . **related to the execution of work to be performed or otherwise in the performance of any of its obligations.**[110]

BAE argues that this provision offers no protection to Raytheon from all third-party claims, only those claims where a third party's harm arises from BAE's negligence.[111] And Raytheon does not allege in its Complaint that South Korea's

---

[108] *Olin Corp. v. Consol. Aluminum Corp.*, 807 F. Supp. 1133, 1141 (S.D.N.Y. 1992), aff'd in part, vacated in part, 5 F.3d 10 (2d Cir. 1993).

[109] *Heimbach v. Metro. Transp. Auth.*, 553 N.E.2d 242, 246 (N.Y. 1990) (internal citations and quotation omitted).

[110] Pl.'s Compl. Ex. 1 at UCA_00026 (emphasis added).

[111] Def.'s Br. at 34.

claim of harm was "directly caused . . . [by BAE's] negligence".[112] Raytheon instead argues that BAE made misrepresentations to South Korea that caused that foreign government to sue Raytheon in South Korean courts.

The indemnification clause above, strictly construed, requires (1) a third-party claim, that is (2) directly caused by BAE's negligence, and that is (3) related to the work to be performed under the Subcontract. Raytheon does not allege in its Complaint that South Korea was directly harmed by BAE's negligence arising from Program or Subcontract work. Nor is South Korea's lawsuit premised on the Subcontract at all—it alleges a breach of Raytheon's agreement with South Korea as South Korea's radar supplier. The indemnification claim (Count III), therefore, must be **DISMISSED**.

### D. Unjust Enrichment Claim.

Raytheon complains that it "conferred significant benefits on BAE outside of Raytheon's required [scope] of work, including performing some of BAE's scope of work, for which efforts Raytheon was not compensated."[113] Raytheon says BAE has been unjustly enriched by having received the benefit of Raytheon's work and then terminating the Subcontract.

---

[112]     Pl.'s Compl. Ex. 1 at UCA_00026.

[113]     Pl.'s Compl. ¶ 163.

A claim of unjust enrichment is premised on a quasi-contract theory of recovery.[114] A quasi-contract is an "obligation imposed by equity to prevent injustice . . . in the absence of an actual agreement between the parties."[115] A party can pursue both a breach-of-contract claim and a quasi-contract claim only when the contract does not govern the dispute in issue.[116] "[R]ecovery in quasi-contract outside the existing contract may be had if a party has rendered additional services upon extracontractual representations by the other party."[117]

To prevail on an unjust enrichment claim under New York law, "a plaintiff must establish: (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution."[118] "The measure of

---

[114] *Georgia Malone & Co. v. Ralph Rieder*, 926 N.Y.S.2d 494, 497 (N.Y. App. Div. 2011), aff'd sub nom. *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743 (N.Y. 2012).

[115] *Id.* (internal citations omitted).

[116] *Dart Brokerage Corp. v. Am. Commerce Ins. Co.*, 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013) (internal quotation omitted) ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue.").

[117] *U.S. East Telecomm., Inc. v. U.S. West Comm. Servs., Inc.*, 38 F.3d 1289, 1298 (2d Cir. 1994).

[118] *Price v. Cushman & Wakefield, Inc.*, 829 F. Supp. 2d 201, 217 (S.D.N.Y. 2011) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

damages for an unjust enrichment claim is restricted to the 'reasonable value' of the benefit conferred upon the defendant."[119]

BAE argues that the unjust enrichment claim must fail because the Subcontract governs the Upgrade Program and therefore precludes claims in quasi-contract. But because Raytheon's claim can be said to rest on benefits from additional products and services conferred "outside of Raytheon's required [scope] of work,"[120] it can be said to lie outside the scope of the existing contract.

Raytheon has adequately alleged that (1) BAE benefited from Raytheon's extra-contractual work, (2) at Raytheon's expense, and (3) that "equity and good conscience require BAE to make restitution."[121] Raytheon having met these requisite pleading elements for its unjust enrichment claim (Count IV), the claim survives dismissal here.

---

[119] *Price*, 829 F. Supp. 2d at 217 (citing *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009)).

[120] Pl.'s Compl. ¶ 163. Specifically, Raytheon "assisted BAE in applying for certification to export its Modular Mission Computer, which was BAE's responsibility . . . . This assistance conferred a significant benefit on BAE for the Upgrade Program, and potentially on other programs as well. Raytheon was not compensated for this extra-contractual help to BAE[.]" Pl.'s Compl. ¶ 92.

[121] Pl.'s Compl. ¶ 166.

## E. NEGLIGENT MISREPRESENTATION CLAIM.

Raytheon next contends that it was substantially harmed by misrepresentations and omissions made by BAE upon which BAE knew Raytheon would rely. Raytheon asserts that it depended on BAE for material and accurate information.[122] Raytheon alleges that BAE misrepresented to it that BAE was obtaining software necessary to the Upgrade Program from the United States Government, when the United States Government had never agreed to provide it.[123] Raytheon also alleges that BAE continually told it that BAE was close to securing the LOA-2, but never informed Raytheon that there were major issues in price negotiations.[124]

In *Van Lake v. Sorin CRM USA, Inc.*, this Court stated that "[i]t is well-settled Delaware law that the Court of Chancery has exclusive jurisdiction over claims of negligen[t] misrepresentation."[125] However, "in examining a negligent misrepresentation claim, . . . the Court must look beyond the 'labeling' of the claim and examine its substance to determine the true nature of the claim. Therefore, the

---

[122] Pl.'s Compl. ¶ 47.

[123] *Id.* ¶ 171.

[124] *Id.* ¶ 172.

[125] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *11 (Del. Super. Ct. Feb. 15, 2013).

question before the Court is whether [the claim] sounds in negligence or negligent misrepresentation."[126]

The Court has previously found that a claim sounded in negligence where the claim, as alleged, did not rise to the level of negligent misrepresentation but sufficiently alleged negligence.[127] But that is not the case here. And Raytheon doesn't allege that it has mislabeled its claim of negligent misrepresentation. Raytheon says instead: "this court of law has jurisdiction over misrepresentation claims raising fraud-like claims and seeking a legal (i.e., non-equitable) remedy, such as damages."[128] On these bases alone, dismissal is warranted.

But the claim is doomed too on its merits. New York case law provides that "[a] claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was

---

[126] *Id.*

[127] *See Iacono v. Barici*, 2006 WL 3844208, at *5 (Del. Super. Ct. Dec. 29, 2006); *Smith v. Peninsula Adjusting Co.*, 2011 WL 2791252, at *4 (Del. Super. Ct. June 16, 2011).

[128] Pl.'s Supp. Letter at 5.

-34-

reasonable reliance upon the information given."[129]   "A 'special relationship' requires a closer degree of trust than an ordinary business relationship."[130]

Our Court of Chancery, applying New York law, instructs that "[c]ommercial parties acting at arms' length in negotiating a contract are not in a special relationship."[131]   BAE and Raytheon were sophisticated commercial parties negotiating at arms' length. Raytheon's claim of negligent misrepresentation (Count V) is **DISMISSED**.

## F. TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS CLAIM.

Under New York law, "[a] claim for tortious interference with prospective business advantage must allege that: (a) the plaintiff had business relations with a third party; (b) the defendant interfered with those business relations; (c) the defendant acted with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there was resulting injury to the business relationship."[132]

---

[129]   *Hudson River Club v. Consol. Edison Co. of N.Y.*, 712 N.Y.S.2d 105, 106 (N.Y. App. Div. 2000) (citations omitted).

[130]   *Solondz v. Barash*, 639 N.Y.S.2d 561, 564 (N.Y. App. Div. 1996).

[131]   *Mitsubishi Power Sys. Americas, Inc. v. Babcock & Brown Infrastructure Grp. US, LLC*, 2010 WL 275221, at *19 (Del. Ch. Jan. 22, 2010) (citing *H & R Project Assocs. v. City of Syracuse*, 737 N.Y.S.2d 712 (N.Y. App. Div. 2001)).

[132]   *Thome v. Alexander & Louisa Calder Found.*, 890 N.Y.S.2d 16, 29 (N.Y. App. Div. 2009).

Raytheon contends that it has alleged sufficient facts "to show that it would have entered into business relationships but for BAE's conduct."[133] Raytheon says that but for BAE's actions, it "would have been able to integrate its radar system into other F-16 aircraft, thereby satisfying a prerequisite to winning a [United States Government] contract."[134] Raytheon further claims that BAE hindered its ability to bid on an upgrade program with Singapore and other, similar United States Government contracts.[135] But Raytheon has done nothing to show that any of these contracts were near inception at the time of BAE's alleged wrongful actions.

Raytheon also claims that it has identified the "unlawful means" required by New York law to state a claim. It says that New York allows a party to demonstrate "unlawful means" through an independent tort, or extreme and unfair economic pressure.[136] But, Raytheon fails to recognize

> "[Unlawful] means" include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract. The distinction thus made between the possible liability of a competitor for interference with performance of an

---

[133]    Pl.'s Ans. at 37.

[134]    *Id.*

[135]    *Id.*

[136]    *Id.* at 38 (citing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 497 (N.Y. 1996)).

existing contract and the more demanding requirements to establish liability for interference with prospective contractual relations reflects a recognition of the difference in the two situations in the relationship of the parties and in the substance and quality of their resulting interests; greater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interests in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer).[137]

Raytheon alleges that BAE "applied unfair economic and coercive economic pressures on Raytheon as part of the Upgrade Program" by refusing to allow Raytheon to communicate with South Korea and by pressuring Raytheon to provide a cost estimate without revealing how BAE intended to use the estimate.[138] These complaints in no way resemble the "unlawful means" defined and required under New York law.[139] Raytheon's restriction on communication with South Korea was included in the Subcontract itself, and Raytheon's allegations relating to the estimate constitute "persuasion alone," not fraud.

---

[137] *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980).

[138] Pl.'s Compl. ¶ 180.

[139] And, as explained previously, the claimed independent tort Raytheon posits as an "unlawful means"—negligent misrepresentation—has not survived dismissal itself. *See* pp. 33–35, *supra*.

Additionally, Raytheon's alleged interests in upgrade programs with other countries undoubtedly fall into the "less substantive, more speculative interests in a prospective relationship" category afforded less protection under New York law.

BAE's Motion to Dismiss on the claim of tortious interference with prospective contractual relations (Count VI) is therefore **GRANTED**.

### G. TORT RELATED TO DAMAGED TRADE AND PROFESSION CLAIM.

Finally, Raytheon alleges that as a result of BAE's misrepresentations and omissions in its dealings with Raytheon and South Korea, Raytheon suffered damage to its professional reputation and to its "ability to compete for other future F-16 upgrade opportunities."[140] BAE contends that New York law does not recognize the tort alleged.

In support of its claim, Raytheon cites to *Singer v. Jeffries*, in which the New York Appellate Division stated that "[a]s a matter of policy, justice and fairness, [a] plaintiff should not be precluded from having his day in court simply because the hornbook index does not list the tortious acts herein involved."[141] The Court further found: that it was "unable to precisely categorize this tort is of no import, since '[i]t is axiomatic that the simple fact that [a plaintiff's] action does not fit into a nicely

---

[140]  Pl.'s Compl. ¶ 186.

[141]  *Singer v. Jeffries & Co.*, 553 N.Y.S.2d 346, 348–49 (N.Y. App. Div. 1990).

defined or established 'cubby-hole' of the law does not in itself warrant the denial of relief to him.'"[142]

But *Singer* has been narrowly construed in the few subsequent cases relying on it,[143] and now stands for the proposition that "'certain allegations can be sustainable as tort actions if they are sufficiently analogous to an established tort action,' such as fraud."[144]

Where other torts alleged in a Complaint "adequately embrace [a plaintiff's] allegations that Defendants harmed his [or its] professional reputation," a *Singer* analysis is inappropriate.[145] The Court should not look to divine a novel alternate tort to cover those failed attempts at others that have been pled in the same Complaint. Here, Raytheon's tort claiming damaged trade and profession largely restates its claims of negligent misrepresentation and tortious interference with prospective contractual relations. Its fate should be no different than theirs. Raytheon's Damaged Trade and Profession Claim (Count VII) is **DISMISSED**.

---

[142] *Id.* at 348 (citing *Seidel v. Greenberg*, 260 A.2d 863, 868 (N.J. Super. Ct. Dec. 24, 1969) (citations omitted)).

[143] *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 325 (S.D.N.Y. 2012) (citing *Lines v. Cablevision Sys. Corp.*, 2005 WL 2305010, at *3 (E.D.N.Y. Sept. 21, 2005) ("In the twenty-two years since *Singer* was decided, the case has rarely been cited, and has never been cited let alone adopted by the New York Court of Appeals. The 'few cases' that have cited *Singer* have 'universally concluded that *Singer* did not create a catch-all tort.'")).

[144] *Id.* (citations omitted).

[145] *Id.* (citing *Eavzan v. Polo Ralph Lauren Corp.*, 40 F.Supp.2d 147, 152 (S.D.N.Y.1998)).

## VI.   CONCLUSION

BAE's Motion to Dismiss is hereby **GRANTED** as to Counts I, III, V, VI, and VII, and **DENIED** as to Counts II and IV.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

Original to Prothonotary
cc:  All counsel via File & Serve